IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | | |
|---|---|---|
| SPIRIT LAKE TRIBE; COLLETTE BROWN; and LOIS LEBEN, | ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. |
| v. | ) ) | |
| BENSON COUNTY, NORTH DAKOTA; BENSON COUNTY BOARD OF COMMISSIONERS DAVID DAVISON, JOHN LUNDE, DORIS GRIFFIN, RON STADUM, AND MICHAEL STEFFAN, in their capacities as Benson County Commissioners; and BONNIE ERICKSON, in her capacity as the Benson County Auditor, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPLAINT**

Spirit Lake Tribe ("Spirit Lake"), Collette Brown, and Lois Leben ("Plaintiffs") bring this Complaint against Benson County, North Dakota (the "County"); Benson County Board of Commissioners David Davison, John Lunde, Doris Griffin, Ron Stadum, and Michael Steffan; and Benson County Auditor Bonnie Erickson ("Defendants"), and allege as follows:

**INTRODUCTION**

1.      Plaintiffs Spirit Lake Tribe ("Spirit Lake"), along with its members Collette Brown and Lois Leben, both of whom are Benson County voters, bring this action to challenge the County's December 28, 2021 adoption of a redistricting plan that violates Native Americans' voting rights. The plan does so by requiring that Benson County commissioners be elected on at-large basis—i.e., by all voters across the County—rather than by the voters in individual election

districts where the candidates reside. The intent and effect of Defendants' decision to employ an at-large voting system is to dilute Native Americans' voting strength in the County.

2.      None of this is news to Defendants. For more than twenty-two years, Benson County has been subject to a consent decree, entered by this Court in *United States v. Benson County*, No. A2-00-30 (D.N.D. Mar. 10, 2000) ("Consent Decree"), attached hereto as Exhibit A, which holds that "*[t]he at-large method of electing the Benson County Commissioners . . . dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act.*" Ex. A at 5, ¶ 2 (emphasis added). Based on that and other findings, the consent decree "*permanently enjoin[s]*" Benson County, the Benson County and its Board of Commissioners, their agents and successors in office, and all persons acting in concert with any of them, "*from administering, implementing or conducting future elections for the Benson County Commission under the current at-large method.*" *Id.* at 5, ¶ 3 (emphasis added). Instead, Benson County's voting plan must "*provide[ ] for five single-member districts*," including at least two "**majority-Native American voting districts**." *Id.* at 7, ¶ 6 (emphasis added).

3.      As Defendants well knew when they adopted the County's at-large redistricting plan on December 28, 2021, the County's decision to replace district-based voting with at-large voting violates the express terms of the Consent Decree. Indeed, the only change in the facts underlying the Consent Decree has been the increase of voting-age Native Americans from 29% of the Benson County population in 2000 to 46% in 2021. As discussed below, that population change confirms that Native Americans are entitled to *at least* two majority-Native voting districts.

4.      Defendants' conduct also violates Section 2 of the Voting Rights Act. By conducting at-large elections for commissioner seats, the County deprives Native American voters of a full and equal opportunity to elect candidates of their choice to the Benson County Board of

Commissioners. Defendants' actions to dilute Plaintiffs' voting rights have the purpose and effect of artificially suppressing the ability of Native Americans to participate equally in the electoral process in Benson County in a stark and measurable way. Under the district-based voting system that it is required to maintain, there should be at least two Native American majority districts, giving members of Spirit Lake and other Native Americans the ability to elect their preferred representatives to the County Commission. Instead, under the County's impermissible at-large system, Native Americans lack a meaningful opportunity to do so.

5. Further, the County's decision to conduct at-large commissioner elections was made with the intent and effect of diluting Native American voting strength, and denying Plaintiffs the opportunity to elect candidates of their choice to the County Commission, in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution. Defendants were well aware of the requirements of the consent decree and the Voting Rights Act, and deliberately ignored them.

6. To remedy Defendants' violations of the consent decree, the Voting Rights Act, and the U.S. Constitution, Plaintiffs seek an order of contempt, a declaratory judgment, and an injunction that prohibit the County from continuing to use the at-large election system and requiring instead that it implement five single-member voting districts, including at least two majority-Native election districts for future elections.

**JURISDICTION AND VENUE**

7. This Court has original jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), 1362, 2201(a), and 2202; 42 U.S.C. § 1983; and 52 U.S.C. § 10308(f).

8. Venue is proper in this Court under 28 U.S.C. §§ 114 and 1391(b).

3

**PARTIES**

*Plaintiffs*

9.      Plaintiff Spirit Lake is a federally recognized Tribe with an enrollment of 7,559 members. Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 86 Fed. Reg. 7554, 7557 (January 29, 2021).  Its Tribal Council has the sole right and authority to represent the Tribe. *Spirit Lake Tribe Constitution and Bylaws*, art. VI, § 1, 5 (Feb. 14, 1946),[1].

10.     The Spirit Lake Tribe is located on the Spirit Lake Reservation in north-central North Dakota. The reservation covers approximately 405 square miles, primarily in Benson County, with smaller areas extending into Eddy, Ramsey, Wells, and Nelson Counties. As of 2019, there were approximately 2,146 voting age individuals living on the Spirit Lake Reservation. According to the 2020 Census, Native Americans constitute 44.3% of Benson County's voting-age population, and a substantial number of Spirit Lake members are voters in Benson County.

11.     Plaintiff Spirit Lake brings this suit on its own behalf to protect its sovereign interests, including its place in the federal system, and as parens patriae to protect its members' statutory and constitutional rights and health and welfare through the prevention of future violations of their constitutional rights.

12.     Plaintiff Collette Brown is Native American and a citizen of Spirit Lake. Ms. Brown resides on the Spirit Lake Reservation in Benson County, and votes in Benson County elections.

13.     Plaintiff Lois Leben is Native American, a citizen of Spirit Lake, and a former member of the Spirit Lake Council. Ms. Leben resides on the Spirit Lake Reservation in Benson County, and votes in Benson County elections.

---

[1] http://www.spiritlakenation.com/data/upfiles/media/SLT%20Constittution%202016.pdf

4

*Defendants*

14.     Defendant Benson County is a political subdivision of the State of North Dakota. The County may sue and be sued in its own name. NDCC § 11-10-01.

15.     Defendant Benson County Board of Commissioners is the governing body of Benson County established under the laws of North Dakota. The Board of Commissioners exercises the legislative and executive powers of the County and is responsible for adopting the requirements governing the election of its members.

16.     Defendants David Davison, John Lunde, Doris Griffin, Ron Stadum, and Michael Steffan are the current members of the Benson County Board of Commissioners. Each of these Defendants is a resident of Benson County and is sued in his or her official capacity.

17.     Defendant Bonnie Erickson is the Benson County Auditor (the "County Auditor") and in that capacity is in charge of elections for the County. Defendant Bonnie Erickson is a resident of Benson County and is sued in her official capacity.

## LEGAL BACKGROUND AND THE CONSENT DECREE

18.     Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

19.     The Supreme Court has "long recognized that . . . at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the population.'"

5

*Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) ("*Gingles*") (quoting *Burns v. Richardson*, 384 U.S. 73, 88 (1966)).

20.     In *Gingles*, the Supreme Court identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

21.     After the preconditions are established, the statute directs courts to assess whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). In *Gingles*, the Supreme Court directed that the Senate Report on the 1982 amendments to the Voting Rights Act be consulted for its non-exhaustive factors (the "Senate Factors"), and that the court should consider in determining if, in the totality of circumstances in the jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2. 478 U.S. at 43-44.

22.     The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent of which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which the minority group bears the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate

effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) "the extent to which members of the minority group have been elected to public office in the jurisdiction"; (8) whether there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members; and (9) where the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous. *Gingles*, 478 U.S. at 36-38; *see also* S. Rep. No. 97-417, at 28-29 (1982).

23.    "There is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. No. 97-417, at 29 (1982).

24.    The Complaint in *United States v. Benson County*, filed March 6, 2000, attached hereto as Exhibit B, alleged that Benson County's at-large method of electing the Benson County Board of Commissioners violated Section 2 of the Voting Rights Action. Ex. B at 5, ¶ 19. The Complaint sought to enjoin Defendants "from administering, implementing, or conducting any future elections for the Benson County Board of Commissioners under the at-large method of election." *Id.* at 5-6, ¶ 2.

25.    The Consent Decree makes a series of findings consistent with the *Gingles* preconditions and Senate Factors described above, all of which the Defendants admitted. The findings include:

a.    "The non-partisan primary election for the county commission coupled with the staggered term and residency requirements narrows the field of candidates, thereby ensuring head-to-head races in the general election and enhancing the likelihood that Native American voters will not be able to elect candidates of their choice to the county commission." Ex. A at 3, ¶ 7.

b.    "The Native American population in Benson County is sufficiently numerous and geographically compact to constitute a majority of the voting age population in two single-member voting districts under a plan containing five districts." *Id.* at 4, ¶ 11.

c.    "Racially polarized voting patterns prevail in elections for the Benson County Commission, and Native American voters in Benson County are politically cohesive. In elections involving Native American candidates and white candidates for the Benson County Commission, Native American voters vote consistently for Native American candidates and white voters vote sufficiently as a bloc to defeat the Native American voters' candidates of choice." *Id.* at 4, ¶ 12.

d.    "Native American citizens within Benson County have suffered from a history of official racial discrimination in voting and other areas, such as education, employment, and housing. Native American citizens in Benson County continue to bear the effects of this past discrimination, reflected in their markedly lower socioeconomic status compared to the white population. These factors hinder Native Americans' present-day ability to participate effectively in the political process." *Id.* at 4, ¶ 14.

e.    "Under the totality of the circumstances, the election system for the members of the Benson County Commission results in Native American citizens having less opportunity than white citizens to participate in the political process and elect candidates of their choice to office." *Id.* at 4-5, ¶ 15.

26.    Based on these and other findings, the Court held in the consent decree:

a.  "The at-large method of electing the Benson County Commissioners, operating in the totality of circumstances in Benson County, dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act." *Id.* at 5, ¶ 2.

b.  "The defendants, their agents and successors in office, and all persons acting in concert with any of them, are permanently enjoined from administering, implementing or conducting future elections for the Benson County Commission under the current at-large election method." *Id.* at 5, ¶ 3.

27.  The Consent Decree remains in full force and effect today, enforceable in accordance with its terms.

28.  Voting practices are unconstitutional under the Fourteenth and Fifteenth Amendments if they were adopted or maintained with a racially discriminatory intent or purpose.

29.  When determining whether discriminatory purpose was a motivating factor, impact may provide an important starting point but is generally not determinative. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Other factors the courts consider include the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes;" the specific sequences of events leading up to the challenged decision; departures from the normal procedural sequence; substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and the legislative or administrative history of the decision. *Id.* at 267-68.

**DEFENDANTS' INTENTIONAL DILUTION OF NATIVE AMERICAN VOTES**

30.     Continuing the long history of intentional discrimination against Native Americans that Benson County conceded in the Consent Decree, Defendants never faithfully implemented, and soon flouted, the Consent Decree's core protections for Native American voting rights.

31.     In March 2004, just four years after the Consent Decree went into effect, the Benson County Board of Commissioners intentionally voted to act in contempt of the Decree's permanent injunction against at-large elections. Minutes of the Benson County Commissioners' March 29, 2004 "special session," attached hereto as Exhibit C, show that the Commissioners reviewed documentation regarding the Consent Decree and nonetheless voted—in direct contravention of the Consent Decree's terms—to "*change from voting for county commissioners 'by district' to 'at large' commencing with the primary election in 2004*" (the "2004 Commission Action"). Ex. C at 1 (emphasis added).

32.     The Commissioners identified no legal basis for this action, never sought any amendment to the Consent Decree to permit this action, and, on information and belief, never notified the U.S. Government, the Spirit Lake Tribe, or any other Native American representative of the Commissioners' intentional decision to eradicate the Consent Decree's protection of Native Americans' voting rights. Not only that, the Commissioners took this drastic action, just months before the 2004 primary election, without public disclosure, and without adopting any formal resolution or otherwise complying with basic procedural requirements applicable to such actions.

33.     On information and belief, Defendants knowingly and intentionally thereafter acted in conformity with the 2004 Commission Action—contrary to the Consent Decree, the Voting Rights Act, and North Dakota law—by counting votes in County Commissioner elections on an at-large basis rather than on a voting district basis. The purpose and effect of this action was to

10

dilute Native American votes in subsequent county elections, depriving Native Americans of the opportunity to elect candidates of their choice.

34.     Defendants persisted in their intentional and unlawful conduct over the succeeding decades, even though two decennial censuses, in 2010 and 2020, showed that Native Americans had steadily increased as a percentage of Benson County voters.

35.     On December 9, 2021, the Benson County Redistricting Board held a meeting to evaluate the need for a new redistricting plan based on the results of the 2020 Census. For the meeting, Nicole Montclair-Donaghy, Executive Director of North Dakota Native Vote, submitted written testimony, attached hereto as Exhibit D, objecting to the County's improper use of the at-large voting method, and reviewed the terms of the Consent Decree which declared that at-large elections for Benson County Commissioners violated the Voting Rights Act. Ex. D at 1.

36.     Ms. Montclair-Donaghy requested that, instead of persisting in its improper use of at-large voting, the County adopt five single-member voting districts with three Native-majority districts. *Id.* In support of that request, Ms. Montclair-Donaghy provided a proposed redistricting map and population data, attached hereto as Exhibit E, demonstrating that the County could adopt such a plan that complied with North Dakota law, as well as the Voting Rights Act and the Consent Decree.

37.     During the December 9 Redistricting Board meeting, the Redistricting Board determined that a new redistricting plan was required as a result of population changes reflected in the 2020 Census.

38.     Also during the December 9 meeting, the Redistricting Board adopted its Redistricting Guidelines, attached hereto as Exhibit F (the "Benson County Redistricting Guidelines"). The Redistricting Board acknowledged that their "guidelines regarding population

equality, minority representation and contiguity and compactness shall be applied as required by the U.S. Constitution, the Voting Rights Act, and other federal and state laws." Ex. F at 2.

39.    As to population equality, the Benson County Redistricting Guidelines provided that "[t]he districts should be drawn so that they are substantially equal in population according to the total county as presented in the 2020 census data"; that any population deviation "between the largest and smallest district must be . . . less than ten percent"; and that any such deviation must be "necessary to achieve a good faith, legitimate objective, such as: preserving the voting strength of minority populations in compliance with the Voting Rights Act." *Id*.

40.    As to minority representation, the Benson County Redistricting Guidelines recognized that the Redistricting Board is required to comply with the Voting Rights Act, specifically adopting the *Gingles* preconditions. *Id.* at 2-3. However, the Redistricting Guidelines make no reference to the fact that Defendants also are subject to a legally-binding consent decree which, pursuant to the *Gingles* preconditions and other Voting Rights Act requirements, forecloses the use of at-large voting in Benson County and requires at least two majority-Native voting districts.

41.    The Benson County Redistricting Guidelines also disregarded the requirements of North Dakota law, which precluded Benson County from counting votes on an at-large basis. Under the North Dakota Century Code, "*[e]ach county commissioner shall be chosen by the qualified electors of the district of which the commissioner is a resident*, except as otherwise provided in section 11-07-03 or 11-07-06" of the Code. NDCC § 11-11-02 (emphasis added).

42.    The exceptions to Section 11-11-02's requirement of district-based voting do not apply in Benson County. Section 11-07-03(1) requires that the redistricting board "first attempt to make the districts contiguous following township lines where practicable, as regular and compact

12

in form as practicable, and as substantially equal in population as possible," with no districting varying more than 10% from the districts' average population. NDCC § 11-07-03(1). Under Section 11-07-03(2), the redistricting board may adopt at-large voting *only* if redistricting pursuant to the standards set forth in Section 11-07-3(1) "*is impossible or would create illogical or impracticable districts.*" NDCC § 11-07-03(2) (emphasis added). As discussed below, compliance with Section 11-07-03(1) is readily achievable, so the provision for at-large voting under Section 11-07-3(2) has no application.[2]

43.     On December 16, 2021, the Redistricting Board gave public notice, attached hereto as Exhibit G, of its intention to adopt a redistricting plan for the County Commission. The notice included a proposed redistricting map, invited public comment, and scheduled a meeting for December 28, 2021, at which a "final decision" on the proposed redistricting plan would be made.

44.     The Redistricting Board's notice made no reference to at-large voting. However, on December 20, 2021, in advance of the December 28, 2021 public meeting, County Auditor Bonnie Erickson advised by email, attached hereto as Exhibit H, that Commissioners "*are elected at large in Benson County*" (emphasis added). Under North Dakota law, the County Auditor is "[the] administrator of elections" and "is responsible to the secretary of state for the proper administration within the auditor's county of state laws, rules, and regulations concerning election procedures." NDCC § 16.1-01-01(4).

45.     On information and belief, Defendants intentionally predicated their 2021 decision to count votes on an at-large basis on the 2004 Commission Action—an action presided over by

---

[2] The exception to the district-based voting requirement in Section 11-07-06 also does not apply to Benson County. It requires at-large voting only if, in an election held on the petition of at least 10% of the qualified voters, 60% of the voters vote to require at-large voting. NDCC § 11-07-06. In Benson County, no such petition was made, and no such election was held.

County Auditor Erickson—even though the decisions in 2004 and in 2021 disregarded the Consent Decree, the Voting Rights Act, and North Dakota elections law.

46.     On December 28, 2021, the Redistricting Board held its public meeting to determine whether the Redistricting Board's proposed district map would be adopted.

47.     For the December 28 Redistricting Board meeting, Chairman Douglas Yankton, Sr., Chairman of Spirit Lake, submitted written testimony, attached hereto as Exhibit I, in which he asked the board to implement five single-member voting districts with three Native-majority districts. Chairman Yankton also discussed the Consent Decree and its requirements in his testimony. Chairman Yankton's testimony was consistent with the testimony and evidence submitted by North Dakota Native Vote Executive Director Nicole Montclair-Donaghy at the December 9, 2021 Redistricting Board meeting.

48.     Yet the Redistricting Board disregarded the testimony and evidence of the leaders of both the Spirit Lake Tribe and North Dakota Native Vote. At the conclusion of the December 28 meeting, the Redistricting Board adopted a Resolution, attached hereto as Exhibit J, approving a new redistricting plan which assumed the ongoing use of at-large voting (the "2021 Redistricting Plan").

49.     Nowhere in the Resolution, and at no point during the December 28 meeting, did the Redistricting Board make any determination that the Redistricting Plan met one of the North Dakota Century Code's exceptions to the statutory prohibition on at-large elections.

50.     Defendants' adoption of the 2021 Redistricting Plan not only violated prohibitions on at-large voting under the Consent Decree, the Voting Rights Act, and North Dakota law, but also violated the population equality requirements under North Dakota law and Benson County Redistricting Board's own redistricting guidelines. The five Commissioner residency districts

provided in the map approved by the Redistricting Board contain a total deviation of more than 18% between the largest and smallest populated districts—8 percentage points greater than the 10% maximum deviation permitted by the Benson County Redistricting Guidelines. Further, North Dakota Century Code, Section 11-07-03(1) requires that "*any* variance from the average population shall be justified in the statement filed pursuant to this section" (emphasis added). No such justification statement was issued by the County.

51.    No justification exists for Defendants' violation of fundamental redistricting requirements as provided under State law and under the Redistricting Board's own redistricting guidelines. As the maps submitted on December 8, 2021 demonstrated, creation of five residency voting districts that satisfy compactness, contiguity, and population equality requirements, while complying with the prohibition on at-large voting under the Consent Decree and North Dakota law, is readily achievable. *See* Ex. E.

52.    Defendants' blatant disregard of North Dakota state law, this Court's Consent Decree, and the Redistricting Board's own redistricting guidelines, as well as its refusal to consider testimony and evidence submitted on behalf of Native American voters calling for compliance with the Voting Rights Act, provides additional evidence of Defendants' intent and purpose to deny Native American voters the ability to equally participate in the electoral process.

**DEFENDANTS ARE VIOLATING PLAINTIFFS' RIGHTS
UNDER THE CONSENT DECREE**

53.    Defendants' continued maintenance of the at-large voting method for electing county commissioners squarely violates the Consent Decree's permanent injunction against "administering, implementing or conducting future elections for the Benson County Commission under the current at-large election method." Ex. A at 5, ¶ 3.

54.     There is no difference between the at-large election method described in the Consent Decree and the at-large method employed under the 2021 Redistricting Plan. Both use non-partisan primary elections, staggered terms of office, residency restrictions for candidates, and at-large voting across the entire county, "thereby ensuring head-to-head races in the general election and enhancing the likelihood that Native American voters will not be able to elect candidates of their choice to the county commission." Ex. A at 2-3, ¶¶ 5, 6, 7.

55.     Thus, Benson County Commissioners are currently elected under an at-large election method that is permanently enjoined in the Consent Decree. Under the current at-large system, just like the one described in the Consent Decree, all five members who qualify to run from one of five residential districts are elected at-large by all members of the County.

56.     Defendants have no justification for violating the Consent Decree. They have never asked this Court to lift or modify the injunctions granted or any of the other determinations made in the Consent Decree. It remains in full force and effect.

57.     Nor would Defendants have any basis for seeking modification of the Consent Decree. The only relevant fact that has changed since the Court entered the Consent Decree is Native Americans' share of the voting-age population. As further discussed below, that percentage has grown from 29.3%, *see* Ex. A at 3, ¶ 10, to 44.3% based on 2020 Census data. Far from justifying the imposition of at-large voting, the increase in Native Americans' share of the voting-age population confirms they are entitled to at least two majority-Native districts.

58.     Plaintiffs, a federally recognized Tribe whose members reside throughout Benson County, and members of that Tribe who resides and vote in Benson County, are intended third-party beneficiaries of the Consent Decree. The Consent Decree is expressly predicated on rights

belonging to Native American voters under Section 2 of the Voting Rights Act. *See* Ex. A at 4-5, ¶¶ 11, 12, 14, 15; *id.* at 5, ¶ 2; *id.* at 7-8, ¶¶ 6-7.

59.    In bringing the Consent Decree action and entering into the Consent Decree, the United States acted, and was obligated to act, on behalf of Plaintiffs, pursuant to the federal Indian trust responsibility, under which the United States has a special duty to carry out the mandates of federal law with respect to the rights of Native American Tribes and their members. Plaintiff Spirit Lake, to which Plaintiffs Collette Brown and Lois Leben belong, is the only federally recognized Tribe whose reservation encompasses part of Benson County.

## DEFENDANTS ARE VIOLATING PLAINTIFFS' RIGHTS UNDER THE VOTING RIGHTS ACT

60.    Even apart from their obligations under the Consent Decree, Defendants' use of at-large rather than district-based voting for county commissioners violates Section 2 of the Voting Rights Act.

61.    Benson County's population and demographics, as recorded in the 2020 Census, are represented in the following table:

### Figure 1. Benson County Population (2020 Census)

|  | Total Population | | Voting Age Population (VAP) | |
|---|---|---|---|---|
| Non-Hispanic Native American and Alaskan Native (Alone or In-Part) | 3,190 | 53.5% | 1,740 | 44.3% |
| Non-Hispanic White (alone) | 2,532 | 42.5% | 2,055 | 52.3% |
| Some Other Race | 249 | 4.1% | 131 | 3.3% |
|  |  |  |  |  |
| **Total Population** | **5,964** |  | **3,926** |  |

17

62.    While Native Americans make up more than half of the population in Benson County, Native Americans are about 44% of the voting-age population.

63.    Most of the Native American voting-age population of Benson County is concentrated in the southeastern portion of the County, where the Spirit Lake Reservation is located.

64.    The Native American population in Benson County is sufficiently numerous and geographically compact in the southeastern portion of the County to constitute voting-age majorities in at least two single-member voting districts.

65.    Indeed, in the proposed map submitted to the Redistricting Board on December 9, 2021, by North Dakota Native Vote, Native Americans constitute voting-age majorities of 97.29%, 70.23%, and 84.59% in each of *three* single-member voting districts in a five-district system. *See* Ex. E at 2 (Population Summary).

66.    Voting in Benson County is racially polarized. Analysis of relevant elections conducted in the County shows racially polarized voting was present in a majority of races, particularly in the few cases involving Native American candidates.

67.    In 2016, there was racially polarized voting in all three contests involving Native American candidates. Chase Iron Eyes ran for U.S. Representative and received over 95% of the Native vote and less than 25% of the non-Native vote. Similarly, Marlo Hunte-Beaubrun ran for Public Services Commissioner and received approximately 95% of the Native vote and just over 25% of the non-Native vote. Likewise, Ruth Buffalo ran for Insurance Commissioner and received approximately 98% of the Native vote and 32% of the non-Native vote.

68.    The largely white, non-Native majority of Benson County votes sufficiently as a bloc to enable it usually to defeat the candidates preferred by the Native voters of the County.

18

69.     In relevant elections in the County, Native American preferred candidates have been defeated a majority of the time.

70.     This was the case in the races run by Native American candidates Mr. Iron Eyes and Mr. Hunte-Beaubrun, both of whom received fewer Benson County level votes to the candidate preferred by the County's non-Native voters. In those races, Mr. Iron Eyes' opponent, Kevin Cramer, received over 75% of the non-Native vote in Benson County and less that 5% of the Native vote, and Mr. Hunte-Beaubrun's opponent Julie Fedorchak received nearly 75% of the non-Native vote and less than 5% the Native vote.

71.     Racially polarized voting and the rate of defeat of Native American preferred candidates have increased in more recent elections in the County. Out of all nine general election contests in the County in 2020, racially polarized voting was present in seven of the nine contests, with the Native American candidate of choice being defeated in all seven of those contests.

72.     In the only County Commissioner election contest that has taken place so far in 2022, which was in the June 14, 2022 primary election, racially polarized voting was present, and the Native American candidate of choice received fewer votes than the non-Native American candidate of choice.

73.     In a majority of the last eight County Commissioner election contests that have taken place since 2018, racially polarized voting was present, and the Native American candidate of choice received fewer votes than the non-Native American candidate of choice. None of those elections involved a Native American candidate.

74.     Despite the Native American population constituting over 44% of the County's voting age population, only one Native American has served on the County Commission since at least 2014.

75.    North Dakota and Benson County have a long history of discrimination against Native Americans. As the Consent Decree found, "Native American citizens within Benson County have suffered from a history of official racial discrimination in voting and other areas, such as education, employment, and housing." Ex. A at 4, ¶ 14.

76.    The pattern of discrimination persists today in and around Benson County. For example, in the voting context, Benson County admitted in the Consent Decree that its at-large method of voting discriminated against Native American voters. And yet, just a few years later, Defendants surreptitiously and unlawfully eliminated the remedy—a prohibition on at-large voting—that this Court had imposed to prevent such discrimination.

77.    In another example, Benson County in 2010 sought to remove a polling place on the reservation, some 100 years after Spirit Lake first sued to establish a reservation polling place. When Benson County filed suit to block removal of the polling place, this Court recognized "[t]he historic pattern of discrimination suffered by members of [] Spirit Lake," and found the removal of the polling place violated Section 2 of the Voting Rights Act. *Spirit Lake Tribe v. Benson Cnty.*, No. 10-cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010).

78.    Native Americans in Benson County also continue to bear the effects of discrimination in such areas as housing, employment, and health, which hinder their ability to participate effectively in the political process.

79.    Benson County uses at least two voting practices that enhance the opportunity for discrimination against Native Americans and dilution of Native American political influence: at large-elections and staggered terms.

80.    Benson County has been unresponsive to the particularized needs of Native American residents. As noted above, Benson County refused to afford Native Americans an

20

opportunity to elect candidates of their choice until 2000, when the County was forced to do so in response to a lawsuit by the U.S. Government. Just two election cycles later, Benson County acted in outright defiance of the resulting Consent Decree, even after reviewing the terms of the Consent Decree and updated population and census figures which demonstrated the importance of its prohibition on at-large elections. In 2010, it took another lawsuit in this Court to prevent Defendants from removing a polling place from Spirit Lake Reservation. The conclusion is inescapable: Defendants respond to the particularized needs of Native Americans only when this Court forces them to do so.

81.    The current at-large method of electing Benson County Commissioners lacks proportionality. It effectively creates five county-wide electoral districts, none of which are majority Native, even though Native American voters constitute a large enough portion of the County's population to constitute an effective majority in at least two out of five single-member voting districts.

82.    In sum, the circumstances leading to and surrounding the adoption of the 2021 Redistricting Plan establish that Defendants committed a clear violation of Section 2 of the Voting Rights Act by diluting Native Americans votes. "[T]he political processes leading to … election" in Benson County "[is] not equally open to participation by" Native Americans, in that they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

**DEFENDANTS ARE VIOLATING THE FOURTEENTH AND FIFTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

83.    Defendants' adoption and maintenance of the at-large voting method, and their elimination of Native American majority voting districts, deliberately discriminates against Native Americans in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution.

21

84.    Defendants admitted in the Consent Decree, more than twenty-two years ago, that Benson County's at-large election system discriminates against Native Americans. Specifically, Defendants admitted that this system "enhance[es] the likelihood that Native American voters will not be able to elect candidates of their choice to the county commission," Ex. A at 3, ¶ 7, and "results in Native American citizens having less opportunity than white citizens to participate in the political process and elect candidates of their choice to office," *id.* at 4-5, ¶ 15; and thus "dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act." *Id.* at 5, ¶ 2. Defendants also admitted that "Native American citizens within Benson County have suffered from a history of official racial discrimination in voting and other areas . . . hinder[ing] Native Americans' present-day ability to participate effectively in the political process." *Id.* at 4, ¶ 14.

85.    Defendants cannot claim that they were ignorant of these facts and admissions when they adopted the 2021 Redistricting Plan. As set forth above, North Dakota Native Vote and Spirit Lake Chairman Yankton explicitly warned the Redistricting Board during its December 9 and 28, 2021 meetings that the at-large election method violated the Consent Decree and the Voting Rights Act. *See* Exs. D and I.

86.    Thus, when Defendants chose to disregard these warnings and maintain an at-large election system in December 2021, they necessarily did so with the intent and for the purpose of achieving exactly what Defendants have admitted an at-large voting system causes: "***Native American citizens having less opportunity than white citizens to participate in the political process and elect candidates of their choice to office***." Ex. A at 4-5, ¶ 15 (emphasis added).

87.    Indeed, Defendants were so determined to favor white voters over Native American voters that, to do so, Defendants flouted North Dakota's explicit ***prohibition*** on at-large voting for county commissioners, and also violated the Redistricting Board's own redistricting guidelines.

As noted above, neither of the two exceptions to the prohibition on at-large voting under North Dakota Century Code Section 11-11-02 have any application to Benson County, or Defendants' redistricting map, and the exceed the Redistricting Board's own maximum population equality deviation by 8 percentage points.

88.    At no time have Defendants offered any justification for their deliberate and knowing violation of the Consent Decree, the Voting Rights Act, the North Dakota Century Code, and their own redistricting guidelines.

89.    Nor does any such justification exist. The uncontroverted evidence, including the redistricting map proposed by North Dakota Native Vote, shows that Benson County could easily and immediately adopt a voting and redistricting plan that complies with all of these requirements. Doing so would simply require Defendants to stop intentionally discriminating against Native American voters.

## CAUSES OF ACTION

### CLAIM ONE
### (Violation of Consent Decree)

90.    All of the foregoing allegations are realleged and incorporated by reference herein.

91.    The Consent Decree remains in full force and effect and is valid and enforceable in accordance with its terms.

92.    Plaintiffs are intended third-party beneficiaries of the Consent Decree and are entitled to enforce its terms, including those terms protecting the rights of Native American voters under the Voting Rights Act.

93.    By adopting an at-large method of electing members of the Benson County Board of Commissioners, Defendants violated and are violating the express terms of the Consent Decree, including its holding that "[t]he at-large method of electing the Benson County Commissioners,

operating in the totality of circumstances in Benson County, dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act," Ex. A at 5, ¶ 2, and its permanent injunction against "administering, implementing or conducting future elections for the Benson County Commission under the current at-large election method." *Id.* at 5, ¶ 3.

94.     Defendants' violation of the Consent Decree was knowing and intentional and constitutes contempt of Court.

95.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will suffer injury. In particular, and without limitation, Plaintiff Spirit Lake has suffered and will suffer the loss or dilution of its members' voting rights and rights of participation in the political process, and Plaintiffs Collette Brown and Lois Leben have suffered and will suffer the dilution of their vote and loss of their rights of participation in the political process.

96.     Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under the 2021 Redistricting Plan and order the adopting of five residency voting districts, including at least two majority-Native districts, will irreparably harm Plaintiffs by subjecting them to racial vote dilution.

97.     Any and all conditions precedent to Plaintiffs' maintenance of this cause of action have been satisfied by Plaintiffs and/or waived y Defendants.

**CLAIM TWO**
**(Vote Dilution in Violation of Voting Rights Act § 2)**

98.     All of the foregoing allegations are realleged and incorporated by reference herein.

99.     The County's Redistricting Plan is a "standard, practice, or procedure" within the meaning of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a).

100.    Voting in Benson County is racially polarized. Native American voters in Benson County are politically cohesive and overwhelmingly support the same candidates. By contrast, the

white majority usually votes as a bloc with the usual result of defeating Native Americans' candidates of choice.

101. Native American voters in Benson County are sufficiently numerous and geographically compact enough to form at least two majority-Native voting districts.

102. Considering the totality of the circumstances in Benson County, Native American voters have less opportunity than white voters in Benson County to participate in the political process and to elect representatives of their choice to the Benson County Commission.

103. Among other factors, there is a long history and ongoing pattern of discrimination in voting, education, employment, health, and other areas in Benson County that diminishes Native American voters' ability to participate equally in the political process. Native Americans are underrepresented in County government, and Benson County officials have been unresponsive to the particular concerns of Native American voters, including in the 2021 redistricting process.

104. These facts, as well as the particular circumstances surrounding the adoption of the 2021 Redistricting Plan, demonstrate that Defendants adopted the Plan with the intent and the result of diluting Native American voter strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

105. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will suffer injury. In particular, and without limitation, Plaintiff Spirit Lake has suffered and will suffer the loss or dilution of its members' voting rights and rights of participation in the political process, and Plaintiffs Collette Brown and Lois Leben have suffered and will suffer the dilution of their votes and loss of their rights of participation in the political process.

106. Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under the 2021 Redistricting Plan and order

the adoption of five residency voting districts, including at least two majority-Native districts, will irreparably harm Plaintiffs by subjecting them to racial vote dilution.

107.    Any and all conditions precedent to Plaintiffs' maintenance of this cause of action have been satisfied by Plaintiffs and/or waived by Defendants.

**CLAIM THREE**
**(Intentional Discrimination in Violation of Voting Rights Act § 2**
**and the Fourteenth and Fifteenth Amendments)**

108.    All of the foregoing allegations are realleged and incorporated by reference herein.

109.    Section 2 of the Voting Rights Act in its relevant part prohibits any "standard, practice, or procedure" that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a).

110.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

111.    The Fifteenth Amendment to the U.S. Constitution provides in relevant part: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

112.    Defendants adopted the at-large method of electing members of the Benson County Board of Commissioners with the discriminatory purpose of diluting Native American voting strength in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments of the United States Constitution.

26

113. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will suffer injury. In particular, and without limitation, Plaintiff Spirit Lake has suffered and will suffer the loss or dilution of its members' voting rights and rights of participation in the political process, and Plaintiffs Collette Brown and Lois Leben have suffered and will suffer the dilution of their votes and loss of their rights of participation in the political process.

114. Plaintiffs have no adequate remedy at law other than the judicial relief sought in this case. The failure to enjoin the conduct of elections under the 2021 Redistricting Plan and order the adoption of five residency voting districts, including at least two majority-Native districts, will irreparably harm Plaintiffs by subjecting them to racial vote dilution.

115. Any and all conditions precedent to Plaintiffs' maintenance of this cause of action have been satisfied by Plaintiffs and/or waived by Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

(1)    assume original jurisdiction over this case;

(2)    enter an order of contempt and declaratory judgment that Defendants' actions in adopting and implementing the current at-large method of electing Benson County Commissioners violate the Consent Decree;

(3)    enter a declaratory judgment that the current at-large method of electing Benson County Commissioners violates Section 2 of the Voting Rights Act, 52 U.S.C. 10301;

(4)    enter a declaratory judgment that the current at-large method of electing Benson County Commissioners was adopted with discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

(5)    enjoin Defendants from failing to conduct Commissioner elections in a manner that complies with the Consent Decree, the United States Constitution, and Section 2 of the Voting Rights Act;

(6)    order the Defendants to conduct immediate organizational meetings to implement compliant elections under a redistricting plan that provides at least two effective Native American voting-age majority single-member commissioner districts;

(7)    award Plaintiffs the costs of this action together with their reasonable attorneys' fees and expenses under 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988(b);

(8)    authorize the appointment of federal observers under 52 U.S.C. § 10302(a) for such period as the Court deems appropriate under the circumstances;

(9)    retain jurisdiction of this action under 52 U.S.C. § 10302(c) for such period as the Court deems appropriate under the circumstances; and

(10)    grant the Plaintiffs any further relief which may in the discretion of the Court be warranted and proper.

Dated: October 7, 2022                                        Respectfully submitted,

/s/ Michael S. Carter
Michael S. Carter                                            David Newmann
OK No. 31961                                                 PA No. 82401
carter@narf.org                                             david.newmann@hoganlovells.com
Matthew Campbell                                             Brittany C. Armour (*admission pending*)
NM No. 138207, CO No. 40808                                  PA No. 324455
mcampbell@narf.org                                          brittany.armour@hoganlovells.com
Allison A. Neswood                                           HOGAN LOVELLS
ND No. 49846                                                 1735 Market Street, 23rd Floor
NATIVE AMERICAN RIGHTS FUND                                  Philadelphia, PA 19103
1506 Broadway                                                Telephone: (267) 675-4600
Boulder, CO 80301                                            Fax: (267) 675-4601
Telephone: (303) 447-8760 (main)
Fax: (303) 443-7776                                          Hilary C. Tompkins

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
1514 P Street NW, Suite D
Washington, D.C. 20005
Telephone: (202) 785-4166
Fax:  (202) 822-0068

Bryan Sells
GA No. 635562
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN L. SELLS,
LLC
Post Office Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212 (voice and fax)

NM Bar No. 9152
hilary.tompkins@hoganlovells.com
HOGAN LOVELLS
555 13th Street NW
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Fax: (202) 637-5910

*Attorneys for the Plaintiffs*